IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 11-cv-01490-LTB-KMT

PHARMATECH ONCOLOGY, INC., a Colorado corporation,

       Plaintiff,

v.

TAMIR BIOTECHNOLOGY, INC., a Delaware corporation,

       Defendant.
_____

ORDER
_____

This matter is before me on three motions: (1) Plaintiff Pharmatech Oncology, Inc.'s Motion for Entry of Default Judgment **[Doc # 7]**; and Defendant Tamir Biotechnology, Inc.'s (2) Motion to Set Aside Entry of Default **[Doc #13]**, and (3) its Motion for Extension of Time to File a Responsive Pleading **[Doc #14]**. For the reasons stated below, I DENY Plaintiff's motion; I GRANT Defendant's motion to set aside the default; and I GRANT Defendant's motion for an extension of time provided that Plaintiff consented to the extension if I set aside Defendant's default.

**I. Background**

This is a breach of contract and unjust enrichment case. Plaintiff asserts that this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Only an abbreviated recitation of the facts is necessary to rule on these motions.

Plaintiff is a Colorado corporation headquartered in Denver. Defendant is a Delaware corporation with New Jersey as its principal place of business. On June 15, 2010, the parties entered into a contract (the "Agreement"), in which Defendant agreed to pay Plaintiff in exchange for

Plaintiff performing certain services in connection with clinical studies Defendant was sponsoring. Plaintiff executed the Agreement at its Denver offices. It required Plaintiff to perform a substantial amount of work in Colorado–including all of the preparation and coordination to carry out the clinical studies. Plaintiff assembled a team of people in Colorado, including a full-time project manager and several associates, to run Defendant's clinical trials. The phone calls and emails between the parties pursuant to the Agreement number in the thousands.

On January 31, 2011, Defendant sent Plaintiff a letter terminating the Agreement and placing the work thereunder "on hold." During the 7.5 months between execution and termination, Plaintiff performed a substantial amount of work and incurred significant costs pursuant to the Agreement. After the termination, Plaintiff sent Defendant numerous letters requesting it to pay the amount Plaintiff claims is due under the Agreement: $323,809.99. Defendant refused.

Plaintiff filed his complaint on June 7, 2011. On that date, Plaintiff also sent Defendant a letter stating the following:

> Pharmatech is willing to make one final attempt to informally resolve this dispute. Accordingly, we will temporarily refrain from serving the Summons and Complaint, provided the parties engage in good faith settlement discussions . . . If I have not heard from you by June 10, Pharmatech will proceed with service and let the court resolve this matter.

Defendant was served with a copy of the summons and complaint on June 21, 2011. It failed to file a timely responsive pleading. The clerk of court entered default against Defendant on July 15, 2011. On August 1, 2011, Plaintiff filed its motion for entry of default judgment, and Defendant filed its motion to set aside the entry of default.

## II. Law

The parties' motions implicate whether the Court has jurisdiction over Defendant and Fed. R. Civ. P. 55(c). I explicate these laws and their interplay in turn.

### *A. Entering a Default Judgment and Personal Jurisdiction*

"[A] district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party who has not appeared in the case." *Dennis Garberg & Associates, Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th Cir. 1997); *accord Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986). This is because a default judgment in a civil case is void if there is no personal jurisdiction over the defendant. *See Williams*, 802 F.2d at 1202. Although a defect in the district court's jurisdiction over a party may be asserted or waived by that party, *see* Fed. R. Civ. P. 12(h)(1), that defect "[is] not waived by default when a party fails to appear or to respond." *Williams*, 802 F.2d at 1202.

"The plaintiff bears the burden of establishing that the exercise of personal jurisdiction over the defendant is proper." *Doe v. Nat'l Med. Servs.*, 974 F.2d 143, 145 (10th Cir. 1992). At this stage of litigation that burden is light. *Id.* Plaintiff need only make a prima facie showing that the court has jurisdiction over the defendant if the question is considered prior to trial and on the basis of affidavits and other written materials. *FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992) (internal quotations omitted); *accord Foundation for Knowledge in Dev. v. Interactive Design Consultants, LLC,* 234 P.3d 673, 677 (Colo. 2010). "A prima facie showing exists where the plaintiff raises a reasonable inference that the court has jurisdiction over the defendant." *Knowledge*, 234 P.3d at 677. All factual disputes are resolved in the plaintiff's favor in determining whether the plaintiff has made a prima facie showing. *Far West Capital, Inc. v. Towne*, 46 F.3d

3

1071, 1075 (10th Cir. 1995); *Knowledge*, 234 P.3d at 677.

### *B. Personal Jurisdiction*

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999). A federal court sitting in diversity applies the laws of the forum state. *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 512 (10th Cir. 1994). Hence, the first step in the analysis is examining Colorado's long-arm statute. That statute permits exercising personal jurisdiction over defendants who transact business in the state. Colo. Rev. Stat. § 13-1-124(1)(a). The statute is construed to grant personal jurisdiction to the full extent permitted under federal law. *See Safari Outfitters, Inc. v. Superior Court*, 448 P.2d 783, 784 (Colo. 1968). The analysis therefore collapses into a single inquiry: whether exercising personal jurisdiction over the defendant comports with due process. *See Knowledge*, 234 P.3d at 678.

Due Process requires that to exercise jurisdiction over an out-of-state defendant, the defendant must have sufficient "minimum contacts" with the forum state such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Minimum contacts may be satisfied by either specific or general jurisdiction. Specific jurisdiction involves a two-step inquiry. The court must first consider whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). If he should, then the court considers whether the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice." *Id.* By contrast, "[w]here a

court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain *general* personal jurisdiction over the defendant based on the defendant's general business contacts with the forum state." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998).

### *C. Rule 55(c)*

Under Rule 55(c), a defendant must show good cause for the Court to set aside an entry of default. Fed. R. Civ. P. 55(c). Courts disfavor default judgments. *Katzson Bros., Inc. v. United States EPA*, 839 F.2d 1396, 1399 (10th Cir. 1988). Put differently, "[t]he preferred disposition of any case is upon its merits and not by default judgment." *Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir. 1970). This judicial preference "is counterbalanced by considerations of social goals, justice, and expediency . . . ." *Id.* Setting aside a default entry rests within the "sound discretion of the trial court, and they are given a great deal of latitude in exercising their discretion as to whether the movant carried his burden." *Nikwei v. Ross Sch. of Aviation*, 822 F.2d 939, 941 (10th Cir. 1987) (internal quotations omitted). "Accordingly, considerable deference is given [to] the trial judge's determination regarding the default judgment." *Id.* That determination "will not be disturbed on appeal, unless such is judged to be clearly wrong." *Id.* (internal quotations omitted).

### III. Discussion

The law elucidates that to decide whether to enter a default judgment, I must first determine whether the Court has jurisdiction over Defendant. *See Garberg*, 115 F.3d at 772.

### *A. Jurisdiction Over Defendant*

For the reasons stated herein, I conclude that the Court has specific jurisdiction over Defendant. I therefore refrain from analyzing whether general jurisdiction exists. I begin by

discussing whether Defendant's conduct and connection with Colorado are such that it should reasonably anticipate being haled into court here–the first step of specific jurisdiction's two-step inquiry. *Benton*, 375 F.3d at 1075.

### 1. Minimum Contacts

This determination involves examining whether Defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Benton,* 375 F.3d at 1076 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Defendant's contacts are sufficient if it "purposefully directed its activities at residents of the forum," *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)*,* and Plaintiff's "claim arises out of or results from" actions by Defendant itself "that create a substantial connection with the forum state." *Asahi Metal Industry Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987).

Plaintiff argues that the Court has jurisdiction over Defendant for a number of reasons. Plaintiff negotiated and executed the Agreement in Colorado. At all a times, Plaintiff was a Colorado corporation headquartered here. The Agreement required Plaintiff to perform a substantial amount of work in Colorado, including all the preparation and coordination necessary to effectuate Defendant's clinical studies. Plaintiff so performed. It assembled a team here to orchestrate the clinical trials, consisting of a full-time project manager and several associates. Plaintiff's chief executive officer was also actively involved. Phone calls and emails between Defendant and Plaintiff number in the thousands. Citing *Iselo Holdings, LLC v. Coonan*, 2010 WL 3630125 (D.Colo. Sept. 10, 2010), and *Knowledge*, *supra*, in support, Plaintiff argues that these facts show Defendant established sufficient minimum contacts with Colorado.

Defendant's response essentially attacks the sufficiency of the allegations in Plaintiff's

motion and complaint, contending that Plaintiff's allegations do not make a prima facie case of personal jurisdiction.  Defendant's core argument is that minimal work was actually performed in Colorado.  It asserts the following in support: None of the clinical studies that Plaintiff was tasked with developing were to be conducted here.  The drug to be tested in the studies was developed outside of Colorado. None of the other entities involved in the clinical trials–Defendant and New York University–performed any work here.

It is worth emphasizing that "[w]hether a non-resident defendant has the requisite minimum contacts with the forum state to establish in personam jurisdiction must be decided upon the particular facts of each case." *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996) (internal quotations omitted).  That a contract between an out-of-state party and a resident of the forum state cannot, standing alone, establish sufficient minimum contacts with the forum is well-settled.  *Burger King*, 471 U.S. at 478.  "[W]ith respect to interstate contractual obligations," however, "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities."  *Id.* at 473 (internal quotations omitted).  Relevant variables for assessing minimum contacts in a contract case include "prior negotiations and contemplated future consequences, along with terms of the contract and the parties' actual course of dealing."  *Id.* at 479.  With these principles in mind, I find that Defendant has "minimum contacts" with Colorado.

To begin, I disagree with Defendant's main contention that minimum contacts are absent because the clinical trials were to take place outside Colorado.  *Benton*, *supra*, is analogous to the instant case and illustrative on this point.  Although the *Benton* court ultimately held that exercising

jurisdiction over the defendant was inconsistent with traditional notions of fair play and substantial justice, largely because the defendant was Canadian, the court found that the defendant had established minimum contacts in Colorado. *See Benton*, *supra*. In *Benton*, the substance of the contract between the Canadian defendant and Colorado plaintiff–purchases and sales of uranium–occurred exclusively outside Colorado. *Benton*, 375 F.3d at 1077. But the court reasoned that the business end of those transactions–the deal brokerage, the coordination between the parties, and the decision-making behind the contract–occurred partially in Colorado. *Id.* In this case, the parties negotiated the Agreement from their respective locations. And although the substance of the Agreement–the clinical trials–was to take place elsewhere, the business end of the relationship took place partially in Colorado. Plaintiff negotiated and executed the Agreement here. Plaintiff performed the Agreement for over seven months here until Defendant terminated. Communications between the parties–sent to Plaintiff in, and by it from, Colorado–continued through the filing of the complaint, almost a full year after the Agreement's execution. These allegations make a prima facie showing that Defendant "engag[ed] in a business relationship with" Plaintiff, "who operates [its] business from Colorado." *See Benton*, 375 F.3d 1077. Defendant therefore "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *See Benton*, 375 F.3d 1077.

Although "phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts," *Towne*, 46 F.3d at 1077, the parties' communications are relevant. *E.g.*, *Benton,* 375 F.3d at 1077 ("[T]he correspondence exchanged between Cameco and Mr. Benton during the negotiation of the MOU provides additional evidence that Cameco pursued a business relationship with a Colorado business."); *Knowledge*, 234 P.3d at 680 (finding that the defendant

has minimum contacts in part because the defendant "communicated extensively with [the plaintiff's] representatives in Colorado concerning their duties under the agreement"). Taking as true Plaintiff's allegations, as I must, *see Towne*, *supra*, the thousands of emails and phone calls between the parties pertaining to the Agreement further evince that Defendant purposefully and knowingly availed itself of a business opportunity in Colorado.

The recent Colorado Supreme Court case, *Knowledge*, *supra*, also supports finding jurisdiction over Defendant. *Knowledge* involved a Colorado non-profit plaintiff and a Rhode Island defendant. 234 P.3d at 677. There, the Colorado plaintiff solicited the out-of-state defendant's web-based program design services. *Id.* The parties negotiated via emails and telephone conversations, and they ultimately executed a contract with each signing it in their respective states and faxing it back. *Id.* The defendant never visited Colorado in relation to his work for the plaintiff, nor did he perform in Colorado. *Id.* The court held that it had jurisdiction over the defendant. *Id.* at 679. Specifically with regards to its finding that Defendant had sufficient minimum contacts with the state, the court reasoned that the complaint stated that a substantial amount of the events giving rise to the plaintiff's claims occurred here. *Id.* Plaintiff's affidavits and the contract also highlighted and specified the scope of work performed in Colorado. *Id.* The court gave weight to the fact that the parties transmitted work to and from Colorado and that they "communicated extensively" regarding their contract and the work performed thereunder, with emails and telephone communications numbering at least in the hundreds. *Id.* at 679-80.

The factual similarities between *Knowledge* and the instant case are patent. Plaintiff's complaint states that the Agreement required Plaintiff to perform a substantial amount of work in Colorado. The complaint, augmented by Plaintiff's affidavits, motions, the Agreement, and other

9

evidence, describes the scope of the work performed here. They also demonstrate that, like *Knowledge,* work was transmitted between the parties from their respective states and that their communication was voluminous and frequent. The Agreement itself identified Plaintiff as a Colorado corporation. *Knowledge* thus supports finding specific jurisdiction over Defendant.

The "touchstone" of the minimum contacts analysis is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Defendant deliberately "reach[ed] out beyond" New Jersey and negotiated for, agreed to, and engaged in, an ongoing, longer-term business relationship with Plaintiff, whom Defendant knew was at all times a Colorado resident. *See Burger King*, 471 at 479-80. Pursuant to that relationship, Defendant communicated thousands of times with Plaintiff while Plaintiff was in Colorado. These contacts did not result from Plaintiff's "unilateral activity," which would preclude jurisdiction over Defendant. *See, e.g.*, *Volkswagen*, 444 U.S. at 298 (holding that personal jurisdiction over the defendant-car manufacturer was inappropriate when its only contacts with the forum resulted from the plaintiff's unilateral activity of driving the defendant's product into another state); *Hanson*, *supra* (holding that personal jurisdiction over the defendant-trustee was inappropriate when the defendant's only contacts with the forum resulted from the plaintiff-settlor's unilateral activity of moving to Florida). Nor are Defendant's contacts of the "random," "fortuitous," or "attenuated" variety that would prevent jurisdiction. *See Burger King*, 471 U.S. at 475. Whether the contacts could individually support finding minimum contacts need not be considered. This is because I conclude this constellation of facts illuminates that Defendant's "conduct and connection with the forum State [was] such that [it] should reasonably anticipate being haled into court [here]." *Benton*, 375 F.3d at 1078 (quoting

*Volkswagen,* 444 U.S. at 297).

Defendant notes that the Agreement provides that New Jersey law shall govern, presumably to imply that the choice-of-law clause militates against the Court finding jurisdiction over it. This is not a forum-selection clause. This Court could exercise jurisdiction and apply New Jersey law. Nevertheless, this provision should not be ignored entirely. *Burger King*, 471 U.S. at 482. The numerous and substantial contacts delineated above, however, weigh in favor of finding jurisdiction.

Plaintiff's claims plainly "arise[] out of or result[] from" Defendant's actions "that create a substantial connection with the forum state"–the second part of the minimum contacts analysis. *OMI*, 149 F.3d at 1091. It was the negotiations, Agreement, communications, performance, and contemplated business relationship that manufactured Defendant's minimum contacts and undergird Plaintiff's claims. *See Knowledge*, 234 P.3d at 681 (concluding that the plaintiff's breach of contract claim "ar[ose] directly out of [the defendant's] contacts with Colorado" because the claim "center[ed] on the provisions of the agreement, which were negotiated by the parties between Rhode Island and Colorado, and [the defendant's] failure to adequately performed under that agreement").

### 2. Fairness and Substantial Justice

Because I conclude that there are sufficient minimum contacts between Defendant and Colorado, I must now consider whether the exercise of personal jurisdiction over Defendant offends traditional notions of fair play and substantial justice. *OMI*, 149 F.3d at 1091. This inquiry involves determining "whether exercising personal jurisdiction over a defendant with minimum contacts is 'reasonable' in light of the circumstances surrounding the case." *Id.*; *accord Knowledge*, 234 P.3d at 682. I consider the following factors in my assessment: (1) the burden on Defendant; (2) the forum state's interest in resolving the dispute; and (3) Plaintiff's interest in receiving convenient and

effective relief. *Knowledge*, 234 P.3d at 682.

An action in Colorado would undeniably burden Defendant. It has no office or employees here. Much of the evidence, however, is electronic, mitigating the burden of gathering and presenting evidence in Colorado. Indeed, "because modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, it will usually not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Burger King*, 471 U.S. at 474 (internal quotations omitted); *accord Knowledge,* 234 P.3d at 682 ("[M]uch of the evidence is presumably electronic, thereby mitigating the burden of gathering and presenting this evidence in Colorado.").

Turning to the second factor, it is axiomatic that "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *Benton*, 375 P.3d at 1079. While the Agreement provides for the application of New Jersey law in any dispute, Colorado nevertheless has an interest in providing Plaintiff as a Colorado resident a forum for his suit against Defendant. *See Knowledge*, 234 P.3d at 682. Finally, Plaintiff's interest in litigating the case here is "naturally strong." *Id.* Plaintiff is headquartered in Colorado, and all of Plaintiff's work pursuant to the Agreement occurred here. Examining these factors together, I conclude that exercising jurisdiction over Defendant is reasonable and is thus consonant with traditional notions of fair play and substantial justice.

### B. "Good Cause" Under Rule 55(c)

Because I concluded in Part III.A, *supra*, that the Court indeed has jurisdiction over Defendant, I now turn to whether I should enter a default judgment. *See Garberg*, 115 F.3d at 772.

Defendant has the burden of proving that the default should be set side. *Nikwei*, 822 F.2d

at 941. The parties agree that the Court may consider the following factors when determining whether Defendant has shown good cause under Rule 55(c): (1) whether the default resulted from Defendant's culpable conduct; (2) whether Plaintiff would be prejudiced if the default should be set aside; and (3) whether Defendant presented a meritorious defense. *See Hunt. v. Ford Motor Co.*, 1995 WL 523646, at *3 (10th Cir. Aug. 29, 1995) (using these factors to analyze whether to set aside the default under Rule 55(c)) (citing *In re Dierschke*, 975 F.2d 181, 183 (5th Cir. 1992)); *see also Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781 (8th Cir. 1998) (same), and *U.S. v. $22,050.00 U.S. Currency*, 595 F.3d 318, 324 (6th Cir. 2010) (same). "These factors are not talismanic and the court may consider other factors." *Hunt, supra* at *3 (internal quotations omitted).

Defendant explains that the default was accidental. Defendant argues that it did not know that service of process had occurred on June 21, 2011, and it therefore did not know of the July 12, 2011, deadline for filing a response pleading. It ascribes this lack of knowledge to the following: The June 7, 2011, letter that Plaintiff sent to Defendant's president and chief executive officer, Mr. Muniz, stated that Plaintiff would refrain from serving Defendant provided the parties engaged in good faith settlement discussions. That is the last Muniz heard about formal service until mid-July 2011. Plaintiff's process server indicated that he left copies of the summons and complaint with Scot LaScala of Corporations Trust Company ("CTC") in Delaware on June 21, 2011. Defendant's principal offices are in New Jersey. Muniz, however, performs most of his duties for Defendant at his Florida office, where he resides. CTC federal expressed the summons and complaint to Defendant's New Jersey office. Unfortunately, the woman Defendant designated to receive and forward such documents was on vacation during the latter part of June and early July, when the summons and complaint arrived. The documents were simply placed on this woman's desk, and,

consequently, were never forwarded to Muniz. When this woman returned, she immediately forwarded them to Muniz, who promptly retained counsel by July 29, 2011. Defendant then filed this motion on August 1, 2011. Defendant next contends that granting its motion would not prejudice Plaintiff. Finally, Defendant asserts several defenses. It previously paid Plaintiff a refundable down payment that exceeds Plaintiff's claim, to which Defendant is now entitled under the Agreement's terms. Plaintiff refuses to provide an accounting for its services and expenses. Lastly, Defendant terminated the Agreement and suspended Plaintiff's work; Plaintiff is thus not entitled to expenses and compensation for services rendered thereafter, if any.

Plaintiff disputes that Defendant has proved the three factors. It argues that "[g]iven the tenor of [its] correspondence, [Defendant] knew or should have known that [Plaintiff] was going to take legal action if its invoice remained unpaid." Furthermore, Defendant was aware that Plaintiff had filed the complaint and would serve it if settlement discussions did not ensue. Plaintiff states that this constitutes culpable conduct. Plaintiff next asserts that Defendant's proffered defenses are conclusory and therefore insufficient. Lastly, Plaintiff claims it will be prejudiced if the default is set aside because "its chances of collecting amounts due from [Defendant] pursuant to a judgement will be significantly hampered by delay" as a result of Defendant's worsening financial condition.

I begin by stating that consistent with the ideology that "[t]he preferred disposition of any case is upon its merits and not by default judgment," *Gomes*, 420 F.2d at 1366, my predilection is to set aside the entry of default. My analysis of the factors supports this predilection.

### 1. Reason for Default

"Generally a party's conduct will be considered culpable only if the party defaulted willfully or has no excuse for the default." *U.S. v. Timbers Preserve, Routt Cnty., Colo.*, 999 F.2d 452, 455

(10th Cir. 1993). I conclude that Defendant's conduct was not of this type and was thus not culpable. Defendant did not consciously disregard the response deadline. Nor did it know of the deadline but forget to file a response. Rather, the woman Defendant designated to receive and forward such documents was on vacation when the summons and complaint arrived. Consequently, they were never forwarded to Muniz. This was particularly problematic because the previous correspondence regarding the dispute had been directed to Muniz, and he had received and reviewed them. While Muniz's inference that because he had not received a summons Plaintiff must not have sent one was erroneous, it was not unreasonable based on the parties' prior dealings. Furthermore, I give weight to the fact that after receiving the summons and complaint, Muniz, acting for Defendant, promptly searched for and retained counsel by July 29, 2011, who then entered their appearance and swiftly filed their motion on August 1, 2011. This does not suggest willful default or a "flagrant disregard for the authority of the court." *Hunt*, *supra* at *4. Whether the facts show "excusable neglect" need not be considered, as that is Rule 60(b)'s standard. *See Garberg*, 115 F.3d at 775 n.6 (explaining that Rule 55(c)'s "good cause" is a "lesser standard" than Rule 60(b)'s "excusable neglect").

Plaintiff's arguments on this factor are unavailing. Plaintiff expects that "[g]iven the tenor of [its] correspondence, [Defendant] knew or should have known that [Plaintiff] was going to take legal action if its invoice remained unpaid." Assuming, *arguendo*, that this is true, it still falls short of showing that Defendant willfully defaulted because it does not establish that Defendant knew the default date. Plaintiff also cites several non-controlling cases for the proposition that Defendant's conduct is culpable because it received actual or constructive notice of the filing. *See TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 2010 WL 5184732 *2 (D.Colo. Dec. 12, 2010) (citing *Pena*

15

*v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985)). There are two problems with this assertion. First, Plaintiff simply postulates notice and fails to formulate an argument for it. Second, assuming, *arguendo*, that Defendant did have constructive notice, *Pena* analyzed whether a defendant had met its burden under Rule 60(b), *Pena, supra*, a higher burden that Defendant need not meet here. *See Garberg*, 115 F.3d at 775 n.6.

### 2. Prejudice to Plaintiff

Other circuits have held that setting aside a default must precipitate more than mere delay to prejudice. *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 98 (2nd Cir. 1993); *Johnson*, 140 at 785; *INVST Fin. Group, Inc. v. Chem-Nuclear Sys., Inc.*, 815 F.2d 391, 398 (6th Cir. 1987). (I note parenthetically that I use these authorities because it does not appear from the parties' briefs that the Tenth Circuit has directly and robustly addressed this issue in the Rule 55(c) context.) Similarly, other circuits have held that prejudice may not be found just because setting aside a default will increase litigation costs, *Currency*, 595 F.3d at 325, or from the fact that the defaulting party will be permitted to defend on the merits. *Johnson*, 140 F.3d at 785. Instead, in those circuits, "[s]etting aside a default must prejudice plaintiff in a more concrete way, such as loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion." *Johnson*, 140 F.3d at 785; *accord Berthelsen v. Kane*, 907 F.2d 617, 621 (6th Cit. 1990). I find these authorities compelling. Using them, I conclude that no such prejudice would result here.

Plaintiff's main contention with this factor is that "its chances of collecting amounts due from [Defendant] pursuant to a judgment will be significantly hampered by any delay." This is because, Plaintiff asserts, Defendant is facing worsening financial difficulties that may inhibit collection. But mere delay is insufficient to find prejudice. *See Enron*, 10 F.3d at 98; *Johnson*, 140

F.3d at 785; *INVST*, 815 F.2d at 398.  Moreover, taking Defendant's allegations concerning its meritorious defenses as true, *see In re Stone*, 588 F.2d 1316, 1319 (10th Cir. 1978), Defendant already paid the money that Plaintiff claims is due.  Defendant's financial circumstances moving forward are therefore inconsequential.  Plaintiff further argues that it has already spent significant resources on this matter, and it will be forced to incur substantially more expenses if the default is set aside.  Prejudice, however, may not be found just because setting aside a default will increase litigation costs. *Currency*, 595 F.3d at 325.  This flows naturally from the jurisprudence that "[t]he preferred disposition of any case is upon its merits and not by default judgment." *Gomes*, 420 F.2d at 1366.

### 3. Meritorious Defenses

I turn lastly to whether Defendant proffers meritorious defenses and conclude that it does. The Tenth Circuit explained that when analyzing this factor in the Rule 60(b) context,

> the court examines the allegations contained in the moving papers to determine whether the movant's version of the factual circumstances surrounding the dispute, if true, would constitute a defense to the action. For purposes of this part of the motion, the movant's version of the facts and circumstances supporting his defense will be deemed to be true.

*Stone*, 588 F.2d at 1319.  The requirement "contemplates more than mere legal conclusions, general denials, or simple assertions that the movant has a meritorious defense." *Id.*  Through its motions and Muniz's affidavit, Defendant explains in tedious detail that it already paid Plaintiff a sizeable refundable down payment, to which Defendant is now entitled per the Agreement, and that Plaintiff never performed the actions under the Agreement for which it now claims damages.  Assuming these are true, *see Stone*, 588 F.2d at 1319, they demonstrate meritorious defenses under the more stringent Rule 60(b).  I therefore conclude that they constitute the same under the more lenient Rule

55(c).

Accordingly, because I find that the Court has jurisdiction over Defendant, *see* Part II.A, *supra*, and that Defendant has shown good cause for the default, I deny Plaintiff's motion for the entry of default judgment motion, and I grant Defendant's motion to set aside the default.

### *C. Defendant's Motion for Extension of Time to File a Responsive Pleading*

Defendant also filed a motion requesting an extension of time to file a responsive pleading, asking for the normal response period of 21 days.  Defendant states that Plaintiff does not oppose the requested extension if Defendant's motion to set aside the default is granted.  Because I granted Defendant's motion to set aside the default, I grant this motion as well, provided that Plaintiff indeed consented to the extension in this circumstance.

### IV. Conclusion

For the reasons set forth above, IT IS ORDERED that

1) Plaintiff's Motion for Entry of Default Judgment **[Doc # 7]** is DENIED;

2) Defendant's Motion to Set Aside Entry of Default **[Doc #13]** is GRANTED; and

3) Defendant's Motion for Extension of Time to File a Responsive Pleading **[Doc #14]** is GRANTED, the same to be filed within 21 days from the date of this order.


Date: October   3  , 2011 in Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE